Conway, Ch. J.
This is a proceeding brought by the trustees under the will of Richard Charles Perkins, deceased, to construe his will in order to determine to whom two shares of the principal of a trust fund created by the testator, each in the amount of $100,000 should be paid, which under paragraph Third of the will the trustees were directed to pay to the General Infirmary at Leeds in Yorkshire, England, and the Bradford Royal Infirmary and Dispensary at Bradford, Yorkshire, England, respectively. Construction is necessary by reason of the fact that subsequent to the date of testator’s death the Government of Great Britain effected certain changes in English hospitals by the passage of the National Health Service. Act of 1946 (9 & 10 Geo. VI, ch. 81), which became effective on July 5, 1948. The principal question to be determined is whether the intended beneficiaries have lost their identity by reason of the changes wrought in them by such Act.
The facts are stipulated in writing by counsel.
The decedent, Richard Charles Perkins, was born in England on August 4, 1840. He entered the United States on April 22, 1865, and became a citizen of the United States on April 14, 1897. He made yearly business trips to England and, during those trips, visited his two brothers and niece, who resided at Park Gates, Bradford, England. He died a resident of New York County on February 27, 1907.
*286 After making certain small bequests, the decedent created a trust of his residuary estate during the joint lives of his wife, Mary Louise Perkins, and his daughter, Florence Julia Perkins, the income from which was to be paid, in part, as annuities to his daughter and his brothers, John and Edward, and his niece, Constance Emma Calvert. The balance of the income was to be paid to his wife during her lifetime and, upon her death, the said balance of the income was to be paid to his daughter during her lifetime. Upon the death of both his wife and daughter, the principal was directed to be paid to the daughter’s issue and, if none, then equally to his surviving brothers and niece, but not to the issue of any brother or niece. The will went on to provide: “If there shall be no lawful issue of my said daughter then living, and no survivor of my said brothers and niece, the entire principal of said trust fund shall then be equally divided and paid over as follows: To the New York Hospital in the City of New York, the General Infirmary at Leeds in Yorkshire, England, and the Bradford Boyal Infirmary and Dispensary at Bradford, Yorkshire, England, the sum of One hundred thousand ($100,000.) dollars each, to be applied by each of said institutions to its general uses; and the remainder of said trust fund shall be divided and paid over in equal shares to my friends, W. L. Wellington, Samuel Pearsall, both now of the Borough of Brooklyn of the City of New York and Eugene Frederick Schleich, now of Jersey City, New Jersey, or to the survivors or survivor of them; but if there be no survivor then the entire principal of said trust fund shall be equally divided and paid over to the three institutions before named.” (Emphasis supplied.)
On or about October 7, 1941, the widow of the decedent, who was the primary life beneficiary of the trust, died a resident of the County and State of New York. The daughter, Florence Julia Perkins, was named in her will as sole legatee. On March 27, 1952, the daughter, who was the secondary life beneficiary of the trust, died a resident of the County and State of New York, without issue her surviving. She had never had issue. Under the daughter’s will, certain jewelry was bequeathed to the American Museum of Natural History and the balance of her estate was bequeathed to St. Stephens Protestant Episcopal Church in the city of New York.
*287 John and Edward, the brothers of the decedent, and Constance, the niece of the decedent, predeceased the decedent’s daughter.
W. L. Wellington and Eugene Frederick Schleich predeceased the decedent’s daughter, but Samuel Pearsall survived the' daughter, and is still living.
On this appeal the appellants are (a) the New York Hospital of the City of New York, (b) the executor of the last will and testament of Florence Julia Perkins (decedent’s daughter) and (c) Samuel Pearsall, sole surviving residuary legatee.
The New York Hospital argues that the English hospitals named by the testator (hereinafter referred to as “Leeds” and “ Bradford ”) did not survive the National Health Service Act as the living leg’al entities intended by testator, with present legal capacity to receive, hold, administer and apply the gifts to the uses specified by testator; that testator manifested not only a “general charitable intent” but also a paramount charitable intent, viz., the care of the sick poor; that the doctrine of cy pres is appropriate whether the English hospitals’ remainder interests were vested or contingent and that the legacies to Leeds and Bradford should be awarded under the cy pres doctrine to the New York Hospital.
The executor of the estate of decedent’s daughter argues that the bequests to the English hospitals were contingent remainders conditioned upon survivorship when the life estates were at an end; that neither of the English hospitals named as beneficiaries in the will was in existence at the end of the trust when the time for vesting arrived; that the legacies to Leeds and Bradford cannot be saved for the governmental instrumentalities established under the National Health Service Act; that upon the lapse of the legacies the property passed as in intestacy to the widow and the daughter as next of kin and that under the will of the daughter, who inherited her mother’s entire estate, the property comprising the lapsed legacies passes to St. Stephens Protestant Episcopal Church in the city of New York, the daughter’s residuary legatee.
Samuel Pearsall, the sole surviving residuary legatee, argues that the bequest to the General Infirmary at Leeds, England, lapsed by reason of its incorporation on August 20, 1937; that the gifts to both Leeds and Bradford lapsed, due to the National Health Service Act; that since the bequests did not vest prior *288 to the effective day of the National Health Service Act, on which date they lapsed, the doctrine of cy pres is inapplicable and that he, as the sole surviving residuary legatee, is entitled to the $200,000.
The Attorney-General, appearing as statutory representative of the indefinite, uncertain and ultimate beneficiaries of a charitable disposition (Personal Property Law, § 12), argues that this court should invoke the doctrine of cy pres, to the end that the ultimate charitable wishes of the testator may be fulfilled, if we find that the English hospitals named by the testator were so altered in status, as a result of the National Health Service Act, as to have lost their capacity to receive and use such bequests.
We turn once again to the stipulation of facts to ascertain the history of Leeds and Bradford and the changes made in them by the National Health Service Act.
The General Infirmary at Leeds, in Yorkshire, England, was established in 1767 as a nonincorporated institution and its principal officers and governors were incorporated by Boyal Charter on August 20, 1937 by the name of the General Infirmary at Leeds. The purposes of the institution as stated in its charter are: ‘ ‘ The treatment of the sick and injured poor; The accommodation and treatment of patients who are able and willing to make payments therefor in pursuance of any Order made in their behalf under the provisions of the Voluntary Hospitals (Paying Patients) Act, 1936; The training of Nurses and Medical Students; The maintenance of an educational centre for the development of research work and the prevention of disease ’ ’. Upon the incorporation of the chartered body, or soon thereafter, the association of natural persons constituting the unincorporated body ceased to function and has ever since been defunct, but the charitable activity continued uninterrupted under the control of the corporate body and so continued until the effective date of the National Health Service Act. In such circumstances the charity would be treated, under English law, as having continuing existence and identity.
By subdivisions (1) and (4) of section 6 of the National Health Service Act, the legal estate in the land, buildings and equipment of the General Infirmary at Leeds vested in the Minister of Health on July 5, 1948, the effective day or “ ap *289 pointed day ’ ’ of the Act, free of any trust previously affecting the property, but for the purposes of his functions under the Act, and with an obligation as far as practicable to secure that the objects for which such property was previously used should not be prejudiced.
Pursuant to subdivision (1) of section 7 of the Act, the endowments (as defined in § 7, subd. [10]) of the General Infirmary at Leeds were vested on July 5, 1948 in the Board of Governors of the United Leeds Hospitals constituted under subdivision (8) of section 11, free of any trust previously affecting such endowments, but on trust for such purposes relating to hospital services or the functions of research under Part II of,the Act as the board might think fit, and with an obligation under subdivision (7) of section 7 to secure so far as reasonably practicable that the objects of the endowments and the observance of any conditions attaching thereto should not be prejudiced.
Prior to July 5, 1948, the management of the corporate body was in the hands of the board of management. On July 5, 1948, the governing body was dissolved by section 78 (subd. [1], par. [c]) of the National Health Service Act. Pursuant to an order of the Minister of Health, the General Infirmary at Leeds is one of the group of hospitals designated as a teaching hospital under subdivision (8) of section 11 of the Act, which means that it is affiliated with a medical college. In pursuance of an order made by the Minister of Health under the said subdivision (8) of section 11, the Board of Governors of the United Leeds Hospital was constituted by the Minister of Health to manage and control the said infirmary in accordance with the provisions of subdivision (3) of section 12 of the Act. The chartered corporation was not dissolved but has no functions to perform.
The Bradford Royal Infirmary located at Bradford, Yorkshire, England (known as the Bradford Infirmary prior to 1897) is the hospital referred to in the will as the Bradford Royal Infirmary and Dispensary at Bradford, Yorkshire, England. It was a nonincorporated institution at all times up to the effective date of the Act on July 5, 1948. The purposes of this institution as stated in its rules and orders are: “ No patient can be admitted unless furnished with a regular recommendation, except in cases of emergency. The only proper objects of the Charity being the Sick Poor, no persons shall *290 be admitted who are able to maintain themselves and pay for medical aid.” The name of the governing body of the Bradford Boyal Infirmary prior to July 5, 1948 was the ‘ ‘ Board of Management of the Bradford Boyal Infirmary.” The functions of the said board did not survive the effective date of the National Health Service Act. Pursuant to two orders of the Minister of Health, made under subdivision (1) of section 11 of the Act, the Leeds Begional Hospital Board was constituted by the Minister of Health for the area of England in which the Bradford Boyal Infirmary was situated and by a scheme submitted by the said regional board and approved by the Minister of Health on June 30, 1948 under subdivisions (3) and (4) of section 11 of the Act respectively, the Bradford “A” Group Hospital Management Committee was appointed to control and manage in accordance with subdivision (2) of section 12 of the Act a group of 11 hospitals and 2 clinics which included the Bradford Boyal Infirmary.
On the appointed day, the property, real and personal, of the Bradford Boyal Infirmary became vested in the Minister of Health under section 6 of the Act, except that under subdivision (4) of section 7 of the Act, the endowments had to be transferred by him to the Hospitals Endowments Fund.
Funds donated in the form of legacies and gifts from private individuals have been received by the Hospital Management Committee, Bradford “ A ” Group, and have been used to provide extra amenities for patients and nursing staff such as a radio for each bed, television sets for wards and the nurses home, special research apparatus, for example, in the X-ray department of the Bradford Boyal Infirmary.
Section 59 of the National Health Service Act provides that the board of governors of any teaching hospital and a hospital management committee shall ‘ ‘ have power to accept, hold and administer any property upon trust for purposes relating to hospital services or to the functions of the Board or Committee under Part II of this Act with respect to research.”
On and after the effective date of the Act, there has continued to be a hospital on the same premises as the General Infirmary at Leeds and it continues to be known by the same name. On and after the effective date of the Act, there has continued to be a hospital on the same premises known as the Bradford Boyal Infirmary and it continues to be known by *291 the same name. The names,1 ‘ The Bradford Royal Infirmary ’ ’, and ‘ ‘ The General Infirmary at Leeds ’ ’, are still used in publications, reports and documents such as the hospital directories, the hospital’s year book, the medical directory, the local government manual and directory, the local telephone directory, and the local and national newspapers, when any reference is made to the hospital.
Prior to the effective date of the Act, the patients at the General Infirmary, excluding one wing, were treated free of charge, but were expected to contribute toward the cost of maintenance if they could afford to do so. No fixed charges were made for medical treatment except X rays. In practice all patients, even those in the main block who could afford to do so, were expected to contribute toward the cost of their accommodation and treatment in the hospital although the doctors gave their services free. Prior to the effective date of the Act, some of the patients in the Bradford Royal Infirmary were treated free of charge and some of the patients were “ treated for pay.” The charges made were adjusted to the patient’s means if the persons paid anything at all, but poor persons were not expected to make any payment at all.
After the enactment of the National Health Service Act, health services in Great Britain became available to everyone regardless of his ability to pay. However, amenities and a small number of private rooms are available for additional charges for others desiring them. Generally speaking, the patients treated at the General Infirmary at Leeds and the Bradford Royal Infirmary since nationalization are in comparable income brackets with those treated prior to nationalization.
The Board of Governors of the United Leeds Hospital and the Bradford “ A ” Group Hospital Management Committee are bodies corporate with perpetual succession by virtue of the National Health Service Act.
It seems clear to us that the testator, Richard Charles Perkins, an Englishman by birth who maintained certain ties with England throughout his lifetime, intended by his gifts to the General Infirmary at Leeds in Yorkshire, England, and the Bradford Royal Infirmary and Dispensary at Bradford, Yorkshire, England, to assist in the care and healing of the sick poor who lived and should live in the area of those institutions and *292 who would be treated at such institutions. That intention can be fulfilled notwithstanding the passage of the National Health Service Act by the corporate bodies which have succeeded to the functions of the Board of Management of the General Infirmary at Leeds and the Board of Management of the Bradford Royal Infirmary. As the Surrogate said: “ The group of persons who conduct the affairs of business or charitable organizations must of necessity change with the passage of time. The legal organization of a charity may be altered very substantially without in any way changing the institution’s essential character.” The testator did not designate the beneficiaries as voluntary hospitals, run by any particular board of managers, or in any particular fashion. He bequeathed the legacies to the institutions themselves. The testator did not annex any conditions to his legacies to Leeds and Bradford. He has not said that his legacies may go to Leeds and Bradford only if they remained ‘ ‘ voluntary ’ ’ hospitals in the traditional sense. A declaration by us to the effect that he would have included such a condition in his will had be been able to see into the future can only be founded in speculation.
The fact that a third person or entity — here the British Government— has undertaken to guarantee Leeds and Bradford against deficits is likewise no reason for divesting those hospitals of the unconditional legacies intended for them. Courts do not strike down legacies upon the ground that the charitable institution already has sufficient funds. We would not deprive Leeds and Bradford of the Perkins legacies upon a showing that they were already richly endowed and had no financial problems to solve or that a private group had undertaken to secure them against deficits, and we fail to perceive why a different result should follow merely because it is the government which has so pledged itself.
It has also been said that payment of the legacy to Leeds and Bradford may result in a benefit to the British taxpayer in that it may bring about a pro tanto reduction in the sum appropriated by the government for Leeds and Bradford. The record does not assist us in determining the accuracy of that supposition. Assuming arguendo that the payment of the legacies to Leeds and Bradford will bring about a pro tanto reduction in the sum appropriated by the government for them and so will confer a benefit upon the British taxpayer, we do not feel that *293 such fact justifies a holding that the gifts intended for Leeds and Bradford have failed. The gifts will not serve only to relieve the taxpayer’s burden; they will serve the purposes for which they were intended. The benefit to the individual British taxpayer—which, at best, will be slight—is incidental. The testator’s object was to have his money used by the governing bodies of Leeds and Bradford for purposes connected with their services. That object can be accomplished despite the National Health Service Act.
The class of people now treated at Leeds and Bradford is no different from the class which testator intended to benefit by his bequests. Of course, since the passage of the National Health Service Act, hospitals in England must treat all persons without regard to their wealth or poverty. However, that does not mean that the character of Leeds and Bradford has changed. The poor people were not legislated out of existence by the National Health Service Act nor were the two hospitals shorn of their charitable character by the Act. Before the effective date of the Act the poor people were treated without charge at Leeds and Bradford. They are still so treated at Leeds and Bradford. As we have already noted, the parties have stipulated that the patients presently treated at the two hospitals are in comparable income brackets with those treated prior to nationalization.
"When the British hospitals became subject to the National Health Service Act, their basic needs were met by contributions from the government. "We think it clear, however, that not every need is satisfied out of or by government funds and, like the Surrogate and the Appellate Division, we are persuaded that funds such as the Perkins legacies received by the respective corporate bodies can be devoted to the general purposes of the respective hospitals, as the testator directed.
We recognize that it is not possible for us to compel the British Government to respect the particular terms of the legacies, and that Parliament possesses the power to pass additional legislation appropriating to the general use of the government all funds held by the governing bodies of English hospitals. But we are unable to perceive how that fact can justify a declaration that the gifts to Leeds and Bradford have failed. That is, we do not see how the validity of charitable gifts bequeathed to foreign beneficiaries can depend upon whether or not the *294 foreign country has the power to amend charitable corporate charters.
While it is manifest that the remainder here was contingent ■ until the death of the testator’s daughter on March 27, 1952, subsequent to the date of the National Health Service Act, that fact is immaterial inasmuch as the two hospitals which were the objects of testator’s bounty were still in existence as charities at the date of the death of testator’s daughter, and are still in existence as charities.
In the view that we have taken, it is unnecessary to discuss the question of an alternative disposition of the legacies to Leeds and Bradford.
In this proceeding the appellants have sought to benefit by a construction that the share of the two hospitals lapsed. Each of the appellants would have gained a substantial amount if his contention had prevailed. The contentions of the appellants have failed, and there is no reason to penalize the successful parties for the benefit of the unsuccessful parties thereby destroying the legacies by indirection. Accordingly, it cannot be held that the Appellate Division was guilty of an abuse of discretion when it determined that the costs of the construction proceeding should be charged against the entire estate rather than merely against the $200,000 fund payable to the English hospitals.
The order of the Appellate Division should be affirmed, with costs to all parties appearing separately and filing separate briefs, payable out of the estate.
Desmond, Dye, Fuld, Froessel and Burke, JJ., concur with Conway, Ch. J.; Van Voorhis, J.. dissents for reasons stated in the dissenting opinion in Matter of Ablett (3 N Y 2d 261, 279).
Order affirmed.